AYRES, Judge.
This is an action in tort wherein plaintiff seeks to recover damages for personal injuries, and reimbursement of medical expenses, sustained in an accident as the result of a trolley colliding with the rear of an automobile owned and operated by E. M. Althar, with whom plaintiff was riding as a passenger.
The accident occurred near the intersection of Marshall and Lake Streets, in the City of Shreveport, shortly after 5 :00 p. m., August 13, 1957. Both Crow and Althar were employees of the Arkansas Fuel Oil Corporation and were returning to their residences after completion of the day’s activities. Traffic was, at the time, under the control of a traffic officer of the Shreveport Police Department. As the Althar car approached the intersection the officer signalled for a stoppage of the southbound traffic on Marshall Street, whereupon Al-thar stopped and his car was immediately thereafter struck from the rear by a trolley of the defendants proceeding in the same direction. By the force of the impact, plaintiff was thrown first backward, then forward, and then backward again in the car, his head and left knee striking the dash, inflicting the injuries and allegedly precipitating the conditions for which he seeks damages. The defendants admitted negligence on the part of the trolley operator and conceded liability, and limited the issues to one of quantum.
From a judgment in plaintiff’s favor for $1,000, appeals have been taken and perfected by both plaintiff and defendants. Plaintiff contends the award is inadequate, whereas defendants contend the award is excessive.
The injuries allegedly suffered by plaintiff, for which he seeks damages, consist: First, of bruises of the head, shoulder, and left knee; second, aggravation of osteoarthritis; and, third, auricular fibrillation.
Errors allegedly committed by the trial court complained of are: First, failure to recognize that auricular fibrillation was superinduced and caused by the accident; and, second, inadequate award of damages for the other injuries suffered by plaintiff.
*250 Appropriate to a proper understanding and appreciation of the respective contentions of the parties is a brief summary, or statement, of the material facts as shown by the record to have been established on the trial of the case. Following the accident, plaintiff, who was 70 years of age, continued in the Althar car to his residence, where, soon after his arrival, he was attended by his son, Dr. R. Denman Crow, a general practitioner in the City of Shreveport. Upon the doctor’s arrival, plaintiff was found in bed complaining of pain in his back and left knee, and of severe headaches. Sedatives were prescribed to relieve pain and plaintiff was advised to remain in bed.
From an examination made on the following day, the bruises on the shoulder, head, and knee were found to be swollen and discolored, the condition being characterized by the doctor as moderate. Thereafter, plaintiff was attended by his son almost daily. After the elapse of approximately 10 days, plaintiff returned to his work for short periods of time each day. However, on Saturday afternoon, September 7, 1957, while viewing television at his residence, plaintiff suffered an attack of auricular fibrillation with dyspnea, on account of which he was hospitalized from that day until September 13, 1957. After discharge from the hospital, he again resumed his employment, followed by attendance at a convention in Chicago, to which he travelled by automobile, visiting and calling upon customers of his employer en route. On the return trip and while at the Holiday Motor Courts in Terre Haute, Indiana, on October 31, 1957, about 8:30 a. m., plaintiff, having contracted influenza, experienced a second attack of auricular fibrillation. He was there hospitalized until November 3, 1957, when he was returned to Shreveport by plane and hospitalized at the Physicians & Surgeons Hospital until November 16, 1957. No subsequent attacks of auricular fibrillation have been experienced by plaintiff.
We do not deem it necessary to elaborate upon the testimony of the several expert witnesses testifying for both plaintiff and defendants concerning plaintiff’s osteoarthritis. It suffices to say that the consensus of the experts who testified is that while arthritis does not result from, nor is it aggravated or precipitated by, accident or trauma, the symptoms thereof and the pain,, suffering, and discomfort accompanying arthritis may be increased or aggravated in. variable degrees or intensities for a period of time, after the elapse of which the former status or the former extent and degree of pain, suffering, and discomfort will be resumed. It is recognized, however,, that where arthritis exists but is dormant and inactive an accident or trauma may cause it to flare up and become activated. Plaintiff was shown to have suffered with arthritis for several years prior to the accident. Therefore, it can be reasonably concluded from the testimony that the accident no doubt caused plaintiff to suffer more severely because of his arthritis, at least, for a time, as a result of the accident and injuries sustained by him. It does not appear, however, that the pain, suffering, and discomfort were of great severity or of long duration. This was given consideration by the trial court in fixing the award for the injuries suffered by plaintiff.
Nor do we deem it necessary to make any comprehensive detailed review of the testimony of the medical experts pertaining to plaintiff’s auricular fibrillation. The term refers to a cardiac irregularity due to disturbed auricular action. The most conspicuous feature is that the pulse is very irregular in both the force and rhythm of the beats. In “The Relation Between Injury and Disease,” Reed & Emerson, page 126, the author states:
“The presence of auricular fibrillation means that the sinoauricular node has lost control of the heart’s action, and that two, three, four or even more portions of the auricular wall all at the same time try to beat independent- *251 1y, hence the auricle does not contract efficiently; it merely quivers, that is, fibrillates. An auricle beating in this manner sends a confused medley of .stimuli to the ventricle, which responds •as strongly as it is able to as many of these as it can.”
The basis of plaintiff’s claim with reference to this affliction is predicated upon the contention that it was caused or produced by the accident of August 13, 1957. For recovery, plaintiff primarily relies up-en the testimony of Dr. M. D. Hargrove, ■a specialist in the treatment of diseases of the heart. While the doctor was of the impression that the attack of auricular fibrillation may have been precipitated by the accident, on the basis that plaintiff had not previously experienced such difficulty in breathing and irregular rhythm of the heart, and that the affliction can be caused 'by trauma; and that the affliction might be ■characterized as transient in type from the fact that it occurred only twice; the doctor stated that auricular fibrillation was a functional disturbance rather than a disease ■of the heart which might be produced or brought on by a variety of things, the exact cause of which is unknown or difficult to determine. The doctor expressed agreement with statements of Dr. Paul Dudley White in his treatise on “Heart Disease,” wherein Doctor White stated,
“Once upon a time it was customary to label any individual over the age of fifty years who showed auricular fibrillation and nothing else wrong as an arteriosclerotic, meaning coronary cardiac victim, but now it is realized that such designation is unjustified. It is perfectly true that cardiac arrhythmias like gray hairs are more common with increasing years, and that a less adequate coronary circulation may be somewhat responsible, but by and large, even in older persons, it is wiser in the absence of other evidence, to regard auricular fibrillation as a disorder of function rather than as a sign of heart disease.”
The witness was in accord with this further statement of Doctor White:
“Auricular fibrillation may be of trivial importance or it may be serious. If it occurs in the form of transient paroxysms in a person without heart disease, it may be disagreeable but nothing more, recurring off and on at longer or shorter intervals, or perhaps, only once or twice without recurrence.”
He expressed agreement with Doctor White, as to the cause of such affliction, who stated:
“The cause of the establishment of the abnormal mechanism of auricular fibrillation is often obscure. In most cases, there is an important grade, or type, of heart disease, or an important toxic or disease process of other nature, but sometimes there is no such cause, the individual seeming perfectly healthy without heart disease or poisoning of any sort; thus the condition is fundamentally a functional disorder and not itself to be classed as- heart disease.”
With reference to the onset of the affliction discovered by Doctor Hargrove on September 7, 1957, some three weeks or more following the accident, the doctor’s opinion was predicated on the fact that plaintiff had not suffered any previous similar affliction, and that shortly after the accident he developed difficulty in breathing and irregular rhythm. As to this, however, the doctor stated that if an accident is to be a precipitating factor in auricular fibrillation it would not be expected to occur a month or three or four weeks after the accident, but more likely to occur within a much shorter space of time, even within hours, or at least days, after the occurrence. As to the occurrence of a second attack in Terre Haute, Indiana, the doctor stated that as the plaintiff had influenza or pneumonia such was the most likely cause or precipitating factor in the attack on that occasion. The doctor was of the opinion that a man of plaintiff’s age was *252 subject to a transient incident of auricular fibrillation without any disease or without any precipitating factor such as a accident; nor could the doctor recall any specific case in his experience or from any textbook wherein auricular fibrillation was caused by an injury which was not of the crushing type to the chest or thorax.
Dr. Richard B. Langford was of a similar opinion and stated that while the affliction might be precipitated by trauma, the trauma would necessarily have to be very severe and by a direct blow to the chest or the region of heart. Like Doctor Har-grove, he knew of no case in his own experience, or from textbooks, where the patient suffered from an auricular fibrillation resulting from trauma that did not involve a severe impact or blow to the chest. Doctor Langford examined plaintiff a year following the accident and found that plaintiff’s pulse rate was 74, which he characterized as normal for a man of any age, and his blood pressure 140 over 90, which was said to be normal for a man of 70 years of age. An electrocardiogram made at the time showed a completely normal rythm of the heart. No auricular fibrillation was evident at that time and there was no abnormality whatsoever.
The accident was not severe. It did not cause any shock or serious physical injury to Mr. Crow. Mr. Althar did not see fit to take him to the hospital. Neither did his son, Dr. R. Denman Crow, see fit to cause his father to be hospitalized until the incident of September 7, 1957, which occurred, as stated, while plaintiff was viewing television at his residence. For several days prior thereto, he had been going to his office for short periods of time each day.
Viewing the record from a standpoint most favorable to plaintiff, the consensus of the medical experts who testified in the case is that while trauma may precipitate auricular fibrillation, the trauma must be direct to the region of the heart and of a very severe intensity. No such physical impact is shown to have taken place in this case. From the evidence, it can possibly be inferred that mild cases of auricular fibrillation may not be discovered until after an accident. There is no positive evidence that injuries cause it.
The trial court concluded that plaintiff’s auricular fibrillation was not caused by the accident of August 13, 1957, and, with that conclusion, after a thorough consideration of the entire record, we concur. On the basis of this conclusion, we consider the award made neither excessive nor inadequate.
After trial and before submission of the cause' for decision in the trial court, plaintiff filed and urged a motion to reopen the trial of the case so that Dr. R. Denman Crow might be further interrogated as to the first appearance or onset of the auricular fibrillation with which it was later determined plaintiff suffered. The minutes reflect that for oral reasons assigned by the court, the motion was overruled. The object of the testimony sought to be introduced is to establish that the affliction developed soon after the accident. Doctor ITargrove’s testimony was predicated upon that assumption and upon the history of the case, including the initial symptoms as related to him by Doctor Crow. It is therefore obvious the testimony could serve no additional or useful purpose, and that its introduction would not change the conclusions reached or affect the result of the trial. The motion was, therefore, in our opinion, properly overruled.
For the reasons herein assigned, the judgment appealed is affirmed, the cost of the appeal to be paid by plaintiff-appellant.
Affirmed.