120 So.2d 342 (1960)
Mrs. Ruth B. MADISON et al., Plaintiffs-Appellants,
v.
SOUTHERN FARM BUREAU CASUALTY INSURANCE CO. et al., Defendants-Appellees-Appellants.
No. 9172.
Court of Appeal of Louisiana, Second Circuit.
April 28, 1960.
Rehearing Denied May 23, 1960.
Certiorari Denied June 29, 1960.
*343 Madison, Madison, Files & Shell, Bastrop, for appellants.
Cotton & Bolton, Rayville, for appellees-appellants.
AYRES, Judge.
Mrs. Ruth B. Madison and H. F. Madison, Jr., wife and husband, seek to recover damages resulting from a motor vehicle collision of May 18, 1957, at the intersection of North Fourth Street and Louisville Avenue in the City of Monroe. Her claim is for personal injuries and his, for hospital and medical expenses incurred for the treatment of his wife's injuries and for property damage to their automobile.
Louisville Avenue, a segment of U. S. Highway 80, is a 4-lane thoroughfare with an east and west course through the City of Monroe. North Fourth Street, a 2-lane thoroughfare, is a segment of U. S. Highway 165, with a north and south course. These thoroughfares intersect and cross at right angles.
Involved were plaintiffs' Chrysler automobile, driven by Mrs. Madison, and a Pontiac car of Robert L. Norsworthy, driven at the time by his then minor son, William C. Norsworthy, who has since been emancipated by marriage. Made defendants were Robert L. Norsworthy, his public liability insurer, and, after his emancipation, William C. Norsworthy.
The question of liability was resolved against defendants and, from a judgment in favor of Mrs. Madison for $4,000, and in favor of her husband for $355.90, all parties appealed. In addition, plaintiffs have answered defendants' appeal and prayed that the award in favor of Mrs. Madison be increased to $17,000 and, in favor of H. F. Madison, Jr., to $2,579.33, itemized as $990.43 for medical expenses already incurred, $1,500 for future medical expenses, and $88.90 for repairs to the automobile.
The evidence eliminates any basis for a serious contention or dispute as to the material facts relative to the occurrence of the accident. The drivers of the vehicles, proceeding in opposite directions on Fourth Street, were approaching Louisville Avenue, Mrs. Madison from the north, intending to cross Louisville Avenue and continue south on North Fourth Street; Norsworthy from the south and intending to make a left turn and proceed west on Louisville Avenue. Both vehicles arrived at the intersection at approximately the same time and both stopped in obedience to a red light. On change of signals, Mrs. Madison first proceeded into the intersection and, after having negotiated about three-fourths of the distance thereof, and after having reached the middle of the two south lanes of the intersecting avenue, the left side of her car was struck by the Norsworthy vehicle as the driver attempted a left turn. The left front bumper of the Norsworthy car struck the left front fender of the Madison vehicle *344 to the rear of the left front wheel. The accident occurred in the southwest quadrant of the intersection while plaintiff's vehicle was in its proper lane.
Norsworthy testified that he anticipated Mrs. Madison would make a right turn as she entered Louisville Avenue and that he intended to make a left turn and follow her. He was, however, looking for Shipley's Do-Nut Shop, which he thought was to his left on Louisville, but, to be sure, he glanced to his right looking for the shop sign. On looking back, the accident appeared imminent and, notwithstanding his strenuous application of his brakes, actually occurred. Mrs. Madison's version of the occurrence is that after she began the negotiation of the intersection the Norsworthy vehicle remained in a stationary position while he was looking to his right; that she thought, therefore, he was going to turn in that direction but, after she had reached the middle of the intersection, he turned his "blinkers" on, started up, and ran into her car just before she completed the crossing.
By his movements, it clearly appears Norsworthy was "cutting the corner" and was making an attempt to pass to the left of the center of the intersection in making a left turn.
The statutory rules are that
"The driver of any vehicle on the highways of this state shall ascertain, before turning around upon any highway, that there is no traffic, vehicular or pedestrian, approaching from either direction which will be unduly delayed and shall yield right-of-way to such approaching traffic and shall not attempt to make a turn unless the way is clear." LSA-R.S. 32:235, subd. A.
and that
"* * * the driver of a vehicle * * * when intending to turn to the left shall approach such intersection in the lane for traffic to the right of and nearest the center line of the highway and in turning shall pass beyond the center of the intersection, passing as closely as practicable to the right thereof before turning to the left." LSA-R. S. 32:235, subd. B.
A further pertinent statutory rule is that
"The driver of any vehicle upon a highway of this state, before starting, stopping or turning from a direct line shall first see that such movement can be made in safety, * * *." LSA-R. S. 32:236, subd. A.
In construing the aforesaid statutory provisions, the decisions are replete with pronouncements that left turns are among the most dangerous operations which a motorist may undertake, and that the greatest care and caution is required in their execution. A motorist is therefore enjoined to ascertain, before executing a turn, as to whether approaching traffic will be unduly delayed and, if so, it is his duty to yield the right of way to such approaching traffic and not attempt to make the maneuver unless the way is clear. Washington Fire & Marine Insurance Company v. Firemen's Insurance Company, 232 La. 379, 94 So.2d 295; Choppin v. Conly, La.App., 106 So.2d 846; Zurich Fire Ins. Co. of New York v. Thomas, La.App., 49 So.2d 460; Malone v. Fletcher, La.App., 44 So.2d 352; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264; Home Ins. Co. v. Warren, La.App., 29 So.2d 551; Lane v. Bourgeois, La.App., 28 So.2d 91.
Moreover, when a left turn is being made and an accident occurs, the burden rests heavily on the driver who is attempting the maneuver to explain how the accident occurred and to show that he was free of negligence. Codifer v. Occhipinti, La.App., 57 So.2d 697. And, as stated in Lollar v. Southern Farm Bureau Casualty Ins. Co., La.App., 113 So.2d 337, 339,
"* * * The rule is that the operator of a motor vehicle who desires to make a left turn carries the responsibility of being certain the turn can be *345 made without danger to normal overtaking or oncoming traffic and he must yield the right-of-way."
That Norsworthy violated all the aforesaid rules of the Highway Regulatory Act was clearly established. The provisions of LSA-R.S. 32:235, subd. B, enjoin upon a motorist, in making a left turn, the duty to pass beyond the center of the intersection and as closely as practicable to the right thereof before turning to his left. Instead of complying with this traffic rule, Norsworthy attempted to "cut" across a corner and, in doing so, improvidently invaded Mrs. Madison's traffic lane. Burton v. Southwestern Gas & Electric Company, La.App., 107 So.2d 62.
Equally applicable to Norsworthy's actions is the oft-stated rule that the duty of those in charge of automobiles to look ahead and observe never ceases and that, in legal contemplation, what they can see they do see and the failure to see that which could have been seen by the exercise of due diligence does not absolve a motorist from liability. Jackson v. Cook, 189 La. 860, 181 So. 195. A consideration of the facts as disclosed by the record makes it very clear that Norsworthy attempted a left turn by "cutting" a corner without having first ascertained that he could do so without danger to or unduly delaying oncoming traffic, and that he was not keeping and maintaining a proper lookout. Such was negligence and constituted the proximate cause of the accident.
In the absence of any showing of his freedom from fault, and of contributory negligence on the part of Mrs. Madison, the defendants should respond in damages. Defendants have signally failed to explain satisfactorily how the accident occurred so as to establish Norsworthy's freedom from fault. The plea of contributory negligence is likewise not supported by the evidence and is therefore untenable. The evidence does not establish that Mrs. Madison was not making proper observation or maintaining a proper lookout while negotiating the intersection, nor that she, by any movement of her vehicle, attempted to or indicated in any manner an intention to make a right turn, or that she failed or neglected to apply her brakes or take other evasive action when time, distance, and opportunity permitted her to do so. The conclusion of the trial court as to the question of liability is amply and clearly established by the record.
Beginning with the occurrence of the accident subsequent events may be briefly chronicled. By the force of the impact and the sudden stoppage of her own car, Mrs. Madison was jolted and thrown against the left door, the immediate effect of which was a bruised left arm. Obviously, at the time, no thought was entertained as to the possibility that she might have sustained consequential injuries. No ill effects were immediately experienced while attending to her household duties the remainder of the day. On the following day, however, on arising from a sitting position, pain was experienced in her back. Thereafter, her condition became progressively worse, day by day, until, after a sleepless night, she awoke, on the morning of May 23, 1957, in agony. Thereafter, she was under the constant care and treatment of Dr. Henry E. Guerriero, to whose office she made almost daily visits until July 17, 1957, when she was admitted to the hospital where she remained until August 6, 1957. However, two days before entering the hospital, on July 15, 1957, cystitis, a kidney infection, set in, accompanied by high fever, and she was confined to bed.
Plaintiff's admission to the hospital was due to a heart condition manifesting itself earlier on the morning of her admission, which admittance was by order of Dr. C. T. Yancey, a specialist in cardiology. The condition was diagnosed as auricular fibrillation. Experiences indicated a recurrence of the fibrillation on three or four occasions while plaintiff was undergoing hospitalization and again on January 5, 1959.
*346 The injuries of which Mrs. Madison complains as resulting from the accident, and with which we are concerned on this appeal, may be placed in two classifications, or categories: (1) those pertaining to her back and (2) those to her heart. Claims as to other ailments, notably acute cystitis, have apparently been abandoned.
The trial court found plaintiff's back injuries referable to the accident and awarded damages accordingly, but held no causal relationship had been established between the accident and plaintiff's attacks of auricular fibrillation. In its holding as to the latter and in fixing the award as to the former, plaintiffs contend that the trial court erred. Defendants contend primarily that the award is excessive.
Attention will be directed first to the causal relationship, vel non, between the accident and plaintiff's attacks of auricular fibrillation. This term refers to a cardiac irregularity due to a disturbed auricular reaction, the most conspicuous feature of which is that the pulse is very irregular in both force and rhythm of beats. In "The Relation Between Injury and Disease," Reed & Emerson, page 126, the author states:
"The presence of auricular fibrillation means that the sinoauricular node has lost control of the heart's action, and that two, three, four or even more portions of the auricular wall all at the same time try to beat independently, hence the auricle does not contract efficiently; it merely quivers, that is, fibrillates. An auricle beating in this manner sends a confused medley of stimuli to the ventricle, which responds as strongly as it is able to as many of these as it can."
The basis of plaintiff's claim with reference to this affliction is predicated upon the contention that it was caused or produced by the accident of May 18, 1957. For recovery, plaintiff relies primarily upon the testimony of the several expertsDrs. Guerriero, a general practitioner of long and varied experience; Yancey, a cardiologist; and W. B. Liles, a urologist; and, secondarily, upon a chain of events consisting of pain and suffering over a period of approximately two months, loss of sleep and rest, lowered resistance and weakened condition, anxiety and worry, strain and stress, and even the medical treatments administered for these ailments following the accident. We do not deem it necessary to review, in this opinion, the testimony of these experts in detail or of those testifying on behalf of the defendants, for, in a recent case, Crow v. Shreveport Transit Co., Inc., La.App., 115 So.2d 248, 251, we had occasion to make a thorough study of the identical issue and to review similar testimony of similar experts. There we stated:
"* * * For recovery, plaintiff primarily relies upon the testimony of Dr. M. D. Hargrove, a specialist in the treatment of diseases of the heart. While the doctor was of the impression that the attack of auricular fibrillation may have been precipitated by the accident, on the basis that plaintiff had not previously experienced such difficulty in breathing and irregular rhythm of the heart, and that the affliction can be caused by trauma; and that the affliction might be characterized as transient in type from the fact that it occurred only twice; the doctor stated that auricular fibrillation was a functional disturbance rather than a disease of the heart which might be produced or brought on by a variety of things, the exact cause of which is unknown or difficult to determine. The doctor expressed agreement with statements of Dr. Paul Dudley White in his treatise on `Heart Disease,' wherein Doctor White stated,
"`Once upon a time it was customary to label any individual over the age of fifty years who showed auricular fibrillation and nothing else wrong as an arteriosclerotic, meaning coronary cardiac victim, but now it is *347 realized that such designation is unjustified. It is perfectly true that cardiac arrhythmias like gray hairs are more common with increasing years, and that a less adequate coronary circulation may be somewhat responsible, but by and large, even in older persons, it is wiser in the absence of other evidence, to regard auricular fibrillation as a disorder of function rather than as a sign of heart disease.'
"The witness was in accord with this further statement of Doctor White:
"`Auricular fibrillation may be of trivial importance or it may be serious. If it occurs in the form of transient paroxysms in a person without heart disease, it may be disagreeable but nothing more, recurring off and on at longer or shorter intervals, or perhaps, only once or twice without recurrence.'
"He expressed agreement with Doctor White, as to the cause of such affliction, who stated:
"`The cause of the establishment of the abnormal mechanism of auricular fibrillation is often obscure. In most cases, there is an important grade, or type, of heart disease, or an important toxic or disease process of other nature, but sometimes there is no such cause, the individual seeming perfectly healthy without heart disease or poisoning of any sort; thus the condition is fundamentally a functional disorder and not itself to be classed as heart disease.'
"With reference to the onset of the affliction discovered by Doctor Hargrove on September 7, 1957, some three weeks or more following the accident, the doctor's opinion was predicated on the fact that plaintiff had not suffered any previous similar affliction, and that shortly after the accident he developed difficulty in breathing and irregular rhythm. As to this, however, the doctor stated that if an accident is to be a precipitating factor in auricular fibrillation it would not be expected to occur a month or three or four weeks after the accident, but more likely to occur within a much shorter space of time, even within hours, or at least days, after the occurrence. As to the occurrence of a second attack in Terre Haute, Indiana, the doctor stated that as the plaintiff had influenza or pneumonia such was the most likely cause or precipitating factor in the attack on that occasion. The doctor was of the opinion that a man of plaintiff's age was subject to a transient incident of auricular fibrillation without any disease or without any precipitating factor such as an accident; nor could the doctor recall any specific case in his experience or from any textbook wherein auricular fibrillation was caused by an injury which was not of the crushing type to the chest or thorax.
"Dr. Richard B. Langford was of a similar opinion and stated that while the affliction might be precipitated by trauma, the trauma would necessarily have to be very severe and by a direct blow to the chest or the region of heart. Like Doctor Hargrove, he knew of no case in his own experience, or from textbooks, where the patient suffered from an auricular fibrillation resulting from trauma that did not involve a severe impact or blow to the chest. * * *"
Characteristic of the testimony of the experts in this case, similar to the testimony of the witnesses in the Crow case, is that of Dr. Guerriero wherein he stated in effect that he could not positively state there was a causal relationship between the accident and auricular fibrillation because he did not know, but, from his own experience, he was of the opinion that stress and strain could bring about and precipitate heart disease. Whether the accident, nervousness, suffering, and loss of sleep were responsible for the condition, he could not *348 say for sure but he was inclined to think they could have been, and possibly were, in the absence of any previous attacks.
Dr. Liles' opinion was predicated upon the history of the progression of plaintiff's illness, the accident, pain, cystitis, and irregular heart action, from which he concluded that the sequence was significant, although he could not say that the accident caused the onset of auricular fibrillation.
Dr. Yancey's opinion was likewise predicated upon a sequence of events and, as to such sequence of events, Dr. Samuel B. Nadler, a professor in the School of Medicine of Tulane University, as well as a specialist in internal medicine, examined Mrs. Madison October 14, 1958, and stated:
"* * * I cannot, for the life of me, see the tenuous reason that I would have to follow, which would be that the accident precipitated urinary infection, and urinary infection, in turn, precipitated the rapid beating of her heart.
"I think I am satisfied in my own mind that the accident did not produce her bladder infection and I would say that it would have to be a guess as to whether this urinary infection had anything to do with the fast beating heart because she had experienced a similar episode and been told what to do for it seven years before without an accident and without infection, and because we do know that, so called paroxysmal, that is sudden onset of auricular fibrillation, and a sudden stopping soon afterward, is not too uncommon without cause at all."
The conclusion reached in the Crow case was that the consensus of the medical experts was that while trauma may precipitate auricular fibrillation, the trauma must be directly to the region of the heart and of a severe intensity; no such physical impact was shown to have taken place; and there was no positive evidence that injuries cause it. Such were our conclusions in the Crow case and are our conclusions here.
Next for consideration is the nature, duration, and extent of the injuries allegedly sustained by plaintiff to her back, and the pain and suffering endured as a consequence thereof. Mrs. Madison had, prior to the accident, experienced no difficulty with her back. She attended to her household duties and was active in civic affairs. Her activities since the accident have been greatly curtailed and reduced to a minimum. She is no longer able to stoop, or bend, or stand for any appreciable time. She has had to forego, almost entirely, her activities in civic affairs and many of her household duties. The pain and suffering developing soon after the accident persisted to the date of trial, more than two years following the accident, and, from the medical testimony, it would appear that the pain and suffering may continue for an indefinite period of time and, perhaps, permanently.
Dr. Guerriero first examined plaintiff after the accident May 23, 1957. To him, she related the occurrence of the accident in which her automobile was struck by another; that at first she did not think she was hurt very much but, the day following the accident, she developed stiffness and suffered pain over the lower back, radiating to her left thigh and knee, as well as around the waist and into her left groin, and that she had some soreness and pain in her neck. This examination revealed muscle spasm on both sides of the lumbar spine, with general limitation of motion in the back. Flexion and extension of the thighs on the pelvis caused complaints of severe pain in the lower back, chiefly left of the spine. Her neck was stiff and sore. From this initial examination Dr. Guerriero's diagnosis was a wrenched lumbosacral back, with a possible herniated disc and a whiplash injury to her neck. This diagnosis remained unchanged through subsequent examinations and treatments administered over a prolonged period *349 of time. This condition, together with the attendant pain and disability, was, by the doctor, attributed directly to the accident, notwithstanding that X-rays disclosed a narrowing of the intervertebral space between the fifth lumbar vertebra and the sacrum, accompanied by some hypertrophic and arthritic changes in the spine.
Mrs. Madison was referred by Dr. Guerriero to Dr. Alfons R. Altenberg, an orthopedist, who conducted examinations of her June 29, 1957, and August 13, 1958. His diagnosis of plaintiff's condition was a narrowed sclerotic lumbosacral disc with nerve root irritation on the left side, resulting from an increasing disc protrusion due to the accident and which was worsened or aggravated thereby. From a history of plaintiff's previous condition and the developments following the accident, Dr. Altenberg was of the opinion that plaintiff's back condition resulted from the accident. Plaintiff's symptoms had not subsided on the doctor's second examination, but appeared to be the same as originally found. No exact prognosis could be made by the doctor as to the possibility of plaintiff's recovery. He was inclined, however, to the opinion surgery would not be necessary but that pain would continue to some degree.
From examinations of November 26, 1958, and June 11, 1959, Dr. A. Scott Hamilton, also an orthopedist, was generally in agreement with Dr. Altenberg as to the diagnosis of plaintiff's condition. Specifically, his diagnosis was a degeneration of the intervertebral disc between the fifth lumbar and first sacral vertebrae which antedated the accident but aggravated by trauma and manifested in the left leg by secondary sciatic manifestations. In the absence of any previous difficulty suffered by Mrs. Madison to her back, the doctor was of the opinion that the condition was precipitated by the wreck.
On defendants' behalf, Dr. Faheam Cannon, an orthopedist, examined plaintiff May 12, 1958, and May 26, 1959. Dr. Cannon was in general disagreement with plaintiffs' experts on the proposition that the accident was the precipitating cause of the injuries sustained by plaintiff to her back and the accompanying pain and suffering. He was, however, in accord with their opinion that the trauma sustained in the accident worsened or aggravated her condition.
Further review of the testimony may be dispensed with as, by the great weight of the testimony, it was the consensus of the medical experts that, as a result of the accident, plaintiff sustained serious and permanent injuries, at least aggravating pre-existing conditions which formerly gave no difficulty but, since the accident, have impaired plaintiff's health and caused her to suffer pain, inconvenience, and discomfort which she will, in all probability, continue to suffer indefinitely hereafter and, perhaps, permanently. That her activities, such as the performance of her household duties and of a civic nature, must be and remain hereafter greatly restricted is also the consensus of the medical experts.
The award as made by the trial court, as we understand the reasons given therefor, was based primarily upon the pain and suffering endured and to be endured by plaintiff. Her disability limiting the scope of her activities and the performance of her duties in the home appears to have received little, if any, consideration in the determination of the award. We, therefore, are of the opinion that the award is inadequate and should be increased by at least $2,000.
As to future medical expenses, the evidence does not establish the certainty, but only the remotest possibility, of the necessity of surgery for plaintiff's relief. Hence, failure to make an allowance therefor seems proper. Too, inasmuch as we have concluded, as did the trial court, that plaintiff's onset and attack of auricular fibrillation was not precipitated or brought *350 about by the accident, the hospital and medical expense incurred in the treatment thereof was also properly disallowed.
For these reasons, the judgment appealed is amended by increasing the award to Mrs. Ruth B. Madison to $6,000 and, as amended, is affirmed at defendants-appellants' cost.
Amended and affirmed.